1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                    **NORTHERN DISTRICT OF CALIFORNIA**

8

9

10   **MONY PREAP, EDUARDO VEGA PADILLA,**          **Case No.: 13-CV-5754 YGR**
     **AND JUAN LOZANO MAGDALENO,**
11                                                  **ORDER GRANTING PETITIONERS' MOTION**
               **Plaintiffs-Petitioners,**          **FOR PRELIMINARY INJUNCTION, DENYING**
12                                                  **DEFENDANTS' MOTION TO DISMISS, AND**
               **v.**                               **GRANTING PETITIONERS' MOTION FOR**
13                                                  **CLASS CERTIFICATION**
     **JEH JOHNSON, Secretary, United States**
14   **Department of Homeland Security,** *et al.***,**
15             **Defendants-Respondents.**

16

17          Plaintiffs-Petitioners Mony Preap, Eduardo Vega Padilla, and Juan Lozano Magdaleno

18   ("Petitioners") bring this immigration habeas corpus class action against Jeh Johnson, Secretary of

19   the United States Department of Homeland Security, *et al.* (the "Government") and challenge their

20   detention without bond under Section 236(c) of the Immigration and Nationality Act ("INA"), Title

21   8 U.S.C. § 1226(c) ("Section 1226(c)").  In subsection (a) of the same statute, the INA affords

22   individuals a bond hearing in order to be detained pending removal proceedings.  In contrast,

23   Section 1226(c) requires mandatory detention pending removal proceedings for a specifically

24   defined subset of individuals.  Petitioners argue that they do not fall within the category defined in

25   Section 1226(c), and therefore cannot be subject to mandatory detention.  They seek injunctive and

26   declaratory relief that they, and members of the class, must be afforded a bond hearing so that an

27   immigration judge can determine whether they should be released during the pendency of their

28   removal proceedings.

United States District Court
Northern District of California

Now before the Court are three motions:  (1) Petitioners' Motion for Preliminary Injunction (Dkt. No. 23); (2) the Government's Motion to Dismiss (Dkt. No. 24); and (3) Petitioners' Motion for Class Certification (Dkt. No. 8).  On March 18, 2014, the Court heard oral argument on these motions and on April 1, 2014, the parties provided supplemental briefing.  (Dkt. Nos. 45, 46, 47.) The parties concede that the first two motions – Plaintiff's Motion for Preliminary Injunction and Defendant's Motion to Dismiss – center on a pure issue of statutory interpretation; granting one motion necessarily requires denial of the other.  Thus, the Court begins with that purely legal issue and will then address the Motion for Class Certification.

Having carefully considered the parties' arguments, relevant statutes, case law, and for all the reasons stated herein, the Court finds that Section 1226(c) unambiguously requires mandatory detention for individuals who are detained immediately upon release from custody.  Thus, as Petitioners do not fall within that category, the Court **GRANTS** Petitioners' Motions for Preliminary Injunction and **DENIES** the Government's Motion to Dismiss.  The Court also **GRANTS** Petitioners' Motion for Class Certification, as the class action mechanism easily and efficiently establishes the right of all class members to a bond hearing pursuant to Section 1226(a).

## I.  JURISDICTION

Federal district courts may grant writs of habeas corpus if the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3). Though some immigration decisions, including bond determinations, are not subject to judicial review, *see, e.g.*, 8 U.S.C. § 1226(e), courts may hear the habeas petitions of immigration detainees raising "constitutional claims or questions of law."  *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011) (citations omitted).  Here, Petitioners argue that the Government's practice of subjecting them, and members of the class, to mandatory detention pursuant to Section 1226(c) is unauthorized by the language of the statute itself.  Thus, Petitioners present a pure question of law. The Government does not contest the Court's jurisdiction to hear the case.[1]

---

[1]  The Court notes that in the parties' Joint Submission following oral argument, the Government for the first time, in two sentences, challenged the Court's authority to order injunctive relief in this action.  (*See* Dkt. No. 46 at 2.)  The Government's argument is as untimely as it is unfounded. Section 1226(e) does not bar the relief Petitioners seek.  *See Demore v. Kim*, 538 U.S. 510, 516–17

United States District Court
Northern District of California

## II. FACTUAL BACKGROUND

The factual predicate giving rise to this action stems from the Immigration and Customs Enforcement Agency's ("ICE") treatment of each of the three Petitioners in this action. Each Petitioner was convicted of a crime enumerated in Section 1226(c), and thereafter charged with removal from the United States and detained by ICE. It is undisputed that the predicate offenses for which Petitioners were detained are offenses enumerated in Section 1226(c)(1)(A)-(D). However, ICE's detention of each Petitioner did not commence at the time each Petitioner was released from custody. Rather, ICE detained Mr. Preap seven years after his relevant misdemeanor convictions; Mr. Padilla, over ten years after his relevant convictions; and Mr. Magdaleno over five years later. Because the Government determined that each petitioner could be detained pursuant to Section 1226(c), none was afforded a bond hearing. The ultimate issue is not whether the Government can detain Petitioners pending such proceedings – Petitioners contend that such detention is proper if evidence adduced at a bond hearing establishes that they present a risk of flight or public danger. Rather, the ultimate issue for resolution is whether the Government was statutorily authorized under Section 1226(c) to detain Petitioners mandatorily and without a regularly-scheduled bond hearing.

### A. PETITIONER MONY PREAP

Petitioner Mony Preap is thirty-two years old. (Dkt. No. 8, Ex. A ("Preap Decl.") ¶ 2.) He was born in a refugee camp and is a native of Cambodia. (*Id.*) Preap entered the United States as an infant in 1981 and is a lawful permanent resident. (*Id.*) He is a single father to his son, who is a United States citizen, and a caretaker for his mother, who is in remission from cancer and suffers from seizures. (*Id.* ¶ 4.)

In 2006, Preap was convicted of two misdemeanor counts of possession of marijuana in violation of California Health and Safety Code section 11357(a) and sentenced to time served. (*Id.* ¶ 7; Dkt. No. 26, Ex. 28 ("Preap DHS Record") at 3.) In 2013, Preap was arrested for inflicting corporal injury on a spouse in violation of California Penal Code section 273.5. (Preap Decl. ¶ 7;

---

(2003). Nor does Title 8 U.S.C. section 1252(f) bar said relief. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2009). The argument was not raised in the Government's Motion, nor was it briefed.

1   Preap DHS Record at 3.)  On September 9, 2013, Preap pleaded guilty to battery in violation of

2   California Penal Code section 242 and was sentenced to ninety days of incarceration in the Sonoma

3   County Detention Facility.  (Dkt. No. 26, Ex. 27.)

4           On September 11, 2013, upon his release from the Sonoma County Detention Facility, ICE

5   officers arrested and charged Preap with being removable as a result of his 2006 misdemeanor

6   convictions for possession of marijuana.  (Preap Decl. ¶ 3; Preap DHS Record.)  Preap was

7   detained at an ICE detention facility pending removal proceedings.  (Preap Decl. ¶ 3.)  On

8   December 9, 2013, Preap requested a bond hearing, which was denied on December 10, 2013.

9   (Preap Decl. ¶ 6.)  While Preap was initially found to be removable as charged, on December 17,

10  2013, after three months of detention and after the filing of this action, an immigration judge

11  granted Preap a Cancellation of Removal.  (Mot. to Dismiss at 3; Dkt. No. 26, Ex. 29.)  The

12  Government did not oppose the grant of cancellation of removal and waived its right of appeal.[2]

13  (*See* Dkt. No. 26, Ex. 29.)

14          **B.  PETITIONER EDUARDO VEGA PADILLA**

15          Petitioner Eduardo Vega Padilla is forty-eight years old.  (Dkt. No. 8, Ex. B ("Padilla

16  Decl.") ¶ 2.)  He came to the United States in 1966 from Mexico when he was sixteen months old

17  and became a lawful permanent resident that same year.  (*Id.*)  Padilla has five children, all of

18  whom are United States citizens.  (*Id.* ¶ 3.)  He also has six grandchildren and three siblings who

19  are also United States citizens and live in the Sacramento area.  (*Id.*)  Prior to detention, Padilla

20  lived with his mother, his daughter, and his grandson.  (*Id.*)

21          In 1997, Padilla was convicted for possession of a controlled substance (methamphetamine),

22  a misdemeanor, in violation of California Health and Safety Code section 11377(a).  (*Id.* ¶ 7; Dkt.

23  No. 26, Ex. 3 ("Padilla Records I.").)  Padilla was sentenced to thirty days.  (Padilla Records I.)  In

24  2000, Padilla was convicted of felony possession of methamphetamine in violation of California

25

26  _____

    [2] Although the Government contends that Preap's claim is mooted by his recent Cancellation of

27  Removal, the Court finds that he may properly remain a named plaintiff in this action because of
    the inherently transitory nature of his claim, and because it is capable of repetition, yet evading

28  review.  *See U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 398–99 (1980); *Gerstein v. Pugh*,
    420 U.S. 103, 110 n.11 (1975).

United States District Court
Northern District of California

1  Health and Safety Code section 11377(a) and was sentenced to 180 days of confinement.  (Dkt. No.

2  26, Ex. 4 ("Padilla Records II") at 6.)  While on probation for the second offense, police officers

3  searching Padilla's home discovered a firearm in a shed behind his home.  (Padilla Decl. ¶ 7.)

4  Padilla was convicted of being a felon in possession of a firearm in violation of California Penal

5  Code section 12021(a)(1) and was sentenced to 180 days in jail.  (Padilla Decl. ¶ 7; Dkt. No. 26,

6  Ex. 5 ("Padilla Records III") at 7.)  Padilla was released in 2002.  (Padilla Decl. ¶ 7.)

7          Over ten years after Padilla's release from his sentence from the firearms conviction, on

8  August 15, 2013, ICE charged Padilla with being removable from the United States based on his

9  controlled substances and firearm convictions.  (Dkt. No. 26, Exs. 9, 10.)  ICE agents went to

10  Padilla's home and he turned himself over voluntarily.  (Padilla Decl. ¶ 4.)  On October 15, 2013,

11  an immigration judge found that Padilla was lawfully detained under Title 8 U.S.C. section

12  1226(c); thus, he was not eligible for a bond hearing despite the fact that he was not detained upon

13  his release in 2002.  (Dkt. No. 26, Ex. 13.)

14          On December 3, 2013, an immigration judge ordered Padilla removed from the United

15  States under Title 8 U.S.C. section 1227(a)(2)(A)(iii) as an alien convicted of a controlled

16  substance offense.  (Dkt. No. 26, Ex. 11.)  On December 26, 2013, Padilla appealed the removal

17  order to the Board of Immigration Appeals ("BIA") where it remains pending.  (Dkt. No. 26, Ex.

18  12.)  On February 14, 2014, having been held for six months, Padilla became eligible for a bond

19  hearing in accordance with the Ninth Circuit's preliminary injunction in *Rodriguez v. Robbins*.[3]

20  *See Rodriguez v. Robbins*, 715 F.3d 1127, 1138 (9th Cir. 2013) ("*Rodriguez II*").  On March 7,

21  2014, Padilla received his six-month *Rodriguez* hearing and was released on bond.  (Dkt. No. 38,

22  Ex. B.)

---

26  [3] Under the Ninth Circuit's ruling in *Rodriguez v. Robbins*, once an alien detained under Title 8 U.S.C. section 1226(c) has been subject to detention for six months, the statutory authorization for detention converts to Title 8 U.S.C. section 1226(a) and the Government is obligated to provide an individualized bond hearing.  *See Rodriguez II*, 715 F.3d at 1138.  Effectively, an individual can only be held pursuant to Section 1226(c)—and thus be denied the opportunity for a bond hearing—for six months.  *See id.*

United States District Court
Northern District of California

## C.  Petitioner Juan Lozano Magdaleno

Petitioner Juan Lozano Magdaleno is a fifty-seven year old native of Mexico.  (Dkt. No. 8, Ex. C ("Magdaleno Decl.") ¶ 2.)  Magdaleno came to the United States in 1974 and has been a lawful permanent resident for thirty-nine years.  (*Id.*)  Prior to detention, Magdaleno lived with his wife, two of his four children, his son-in-law, and one of his ten grandchildren, all of whom are United States citizens.  (*Id.* ¶ 4.)

On October 13, 2000, Magdaleno was convicted as a felon in possession of a firearm in violation of California Penal Code section 12021(a)(1).  (Dkt. No. 26, Ex. 16 ("Magdaleno Records").)  According to Magdaleno, he earned a living by purchasing storage units at auctions and selling the contents of the units at his thrift store.  (Magdaleno Decl. ¶ 9.)  Bidders on storage units do not know the contents of the units prior to purchase, and one of the units that Magdaleno purchased contained an old rifle.  (*Id.*)  When police officers came to Magdaleno's thrift store on an unrelated matter, they arrested him for possessing the rifle.  (*Id.*)  Magdaleno was sentenced to 147 days of confinement and 3 years of probation.  (Magdaleno Records.)

On August 21, 2007, Magdaleno was convicted of driving on a suspended license/driving under the influence in violation of California Vehicle Code section 14601.2(a), a misdemeanor, and possession of a controlled substance (methamphetamine), a felony, in violation of California Health and Safety Code section 11377(a).  (Dkt. No. 26, Ex. 18.)  He was sentenced to six months of confinement and released in January 2008.  (*Id.*; Magdaleno Decl. ¶ 10.)

Five years after his release, on July 17, 2013, ICE arrested Magdaleno at his residence and charged him with removal based upon his October 2000 and May 2007 convictions.  (Dkt. No. 26, Ex. 22.)  Magdaleno was detained that same day at the West County Detention Center in Richmond, California.  (Magdaleno Decl. ¶ 3.)

Magdaleno challenged ICE's charges of removability, but the immigration judge denied his application for relief from removal and ordered that he be removed.  (Dkt. No. 26, Ex. 24 at 7–8.)  On December 26, 2013, Magdaleno appealed the removal to the BIA.  (Dkt. No. 26, Ex. 25.)  This appeal remains pending.  (Mot. to Dismiss at 6; Dkt. No. 34 ("Petitioners' Traverse") at 5.)

United States District Court
Northern District of California

1   On December 9, 2013, Magdaleno requested a bond hearing and challenged his detention

2  before an immigration judge.  (Magdaleno Decl. ¶ 3.)  That judge found that Magdaleno was

3  lawfully detained under Title 8 U.S.C. section 1226(c) despite not having been detained by ICE

4  upon release from custody and was not due an individualized bond hearing.  (Dkt. No. 26, Ex. 23.)

5   On February 14, 2014, Magdaleno was provided a *Rodriguez* hearing, and he was denied

6  release due to the determination that he was a flight risk.  (Dkt. No. 28 ¶¶ 2, 3.)  The immigration

7  judge based this determination in part on the fact that Magdaleno was appealing his removal order.

8  (*Id*. ¶ 3.)

9  **III. MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS**

10   The parties agree that resolution of Petitioners' Motion for Preliminary Injunction and

11  Defendant's Motion to Dismiss turns on a question of pure statutory interpretation:  what is the

12  meaning of the phrase "when the alien is released" in Section 1226(c)?[4]  Accordingly, the Court

13  resolves this question first.[5]

14  **A. STATUTORY OVERVIEW**

15   Congress has enacted a multi-layered statutory scheme that provides for civil detention of

16  aliens during removal proceedings.  *See Prieto-Romero v. Clark*, 534 F.3d 1053, 1065 (9th Cir.

17  2008).  Section 1226 is one such provision.  Where an alien falls within Section 1226 determines

18  whether his detention is discretionary (as provided in Section 1226(a)) or mandatory (as provided

19  in Section 1226(c)).

20

21  _____

[4] If Petitioners' interpretation of Section 1226(c) prevails, they will have established all four prongs
22  of the preliminary injunction test: a likelihood of success on the merits, that the balance of equities
tips in their favor, the likelihood of irreparable harm in the absence of injunctive relief, and that
23  granting an injunction will serve the public interest.  If Petitioners' interpretation fails and the
Government's succeeds, Petitioners will have failed to state a claim and the Government's Motion
24  to Dismiss will be granted.

25
[5] Petitioners alternatively argue that the Government's practice of subjecting them to mandatory
26  detention pursuant to Section 1226(c) long after "when [they were] released" from state custody
violates the Due Process Clause of the Fifth Amendment to the United States Constitution.
27  Because the Court finds that Petitioners' claim is conclusively resolved on statutory interpretation
grounds, the Court need not, and therefore does not, address the merits of Petitioners' Due Process
28  argument.

Pursuant to Section 1226(a), when an alien is charged with removal, ICE may seek to have that individual detained pending removal proceedings.  Section 1226(a) affords the Government discretion to release an individual on his own recognizance or on bond while his removal case is pending if the Government determines that release would not present a risk of flight or a danger to the community.  8 U.S.C. § 1226(a).  However, if the alien falls within the category of individuals defined in Section 1226(c), Congress requires mandatory detention while removal proceedings are pending.  This case stems from the parties' disagreement on the legal interpretation and application of Section 1226(c), which reads in pertinent part as follows:

> **(c) Detention of criminal aliens.  (1) Custody.**  The Attorney General ***shall take into custody*** any alien who—
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) ["Inadmissible aliens"] of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii) ["Multiple criminal convictions"], (A)(iii) ["Aggravated felony"], (B) ["Controlled substances"], (C) ["Certain firearms offenses"], or (D) ["Miscellaneous crimes"] of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(i) ["Crimes of moral turpitude"] of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, **or**
>
> (D) is inadmissible under section 1182(a)(3)(B) ["Terrorist activities"] of this title or deportable under section 1227(a)(4)(B) ["Terrorist activities"] of this title,
>
> ***when the alien is released***, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
>
> **(2) Release.**  The Attorney General may release ***an alien described in paragraph (1)*** only if the Attorney General decides pursuant to section 3521 of Title 18 that release of the alien from custody is necessary to provide protection to a witness […], and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a

procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c) (brackets and emphasis supplied).  Thus, the mandatory detention provision of Section 1226(c) admits of only one exception as set forth in subsection (2), *i.e.*, where the need for witness protection exists.  This exception is of no relevance to the instant case.

## B.  SUMMARY OF THE PARTIES' COMPETING INTERPRETATIONS

Petitioners argue that Section 1226(c) is plain in its mandate that "the Attorney General shall take into custody" an individual who has committed an enumerated offense "when the alien is released," not at some later date, but quite simply, at the moment of his or her release.  Said differently, the Government is required to apprehend such individuals "when [they are] released," thus effecting a seamless transition from state to federal custody and ensuring their detention pending removal proceedings.  Petitioners contend that because they were not apprehended by the Government when they were released from state custody, they do not fall within the scope of Section 1226(c)'s mandatory detention provision because they are not aliens "described in paragraph (1)."  *See* 8 U.S.C. § 1226(c)(2).  Rather, aliens "described in paragraph (1)" and consequently denied bond hearings are only those who: (i) commit a predicate offense, and (ii) are taken into custody "when [they are] released."

The Government advances a different interpretation of Section 1226(c), relying on *Matter of Rojas*, 23 I&N Dec. 117 (BIA 2001).  There, in a split decision, the BIA acknowledged that Section 1226(c) does require that custody occur "immediately upon [] release."  *Rojas*, 23 I&N Dec. at 122.  The BIA nonetheless ignored that mandate and determined that Section 1226(c)'s mandatory detention provision applies to any individuals who commit an offense enumerated in Section 1226(c)(1)(A)–(D) regardless of when the individual is apprehended.  The Government argues that the BIA's interpretation of Section 1226(c) should be granted deference because the statute admits of ambiguity that the agency reasonably resolved.   As further evidence that the statute is ambiguous, the Government posits that the term "when" can be understood to mean "at any time after" as well as "immediately upon."  (Deft. Mot. to Dismiss at 15.)  Thus, Government asserts

that its practice of apprehending individuals at any point after they are released complies with Congress's directive.

### C. ANALYSIS

#### 1.  Standard of Review

When Petitioners seek judicial review of the interpretation of a statute by an administrative agency, a court must apply the deferential test for evaluating an agency decision set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron*, a court must first inquire whether "the statute is silent or ambiguous with respect to the specific issue." *Chevron*, 467 U.S. at 843.  If the statute is unambiguous the inquiry ends, for a court need not defer to an agency's interpretation of a statute "[i]f the intent of Congress is clear." *Id*. at 842.  If the statute is found to be ambiguous or silent with respect to the specific issue, the court then evaluates "whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843.

The parties' dispute centers on the meaning of the phrase "when . . . released" as used in Section 1226(c).  The Government asserts that the term "when" can be understood to mean "at any time after" as well as "immediately upon."  Petitioners contend that the term can be read to mean only "immediately upon" or "at the moment of release."  Thus, the Court first turns to the question of what the phrase "when . . . released" as set forth in Section 1226(c) means and whether it is ambiguous.

#### 2.  Whether Section 1226(c) is Ambiguous

When interpreting a statute, the Court must begin with the language of the statute itself.  A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.  *See Perrin v. United States*, 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580–81 (1975); *see also Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (to interpret a statute, a court must give words their "ordinary or natural" meaning) (citation omitted).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co*., 519 U.S. 337, 341

United States District Court
Northern District of California

10

1  (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992); *McCarthy v.*

2  *Bronson*, 500 U.S. 136, 139 (1991)).

3     Section 1226(c)(1) consists of one relevant and long sentence that, when read in a

4  condensed form, provides clarity:

> The Attorney General ***shall*** take into custody any alien who – [has committed an
> enumerated offense], ***when the alien is released***, without regard to whether the
> alien is released on parole, supervised release, or probation, and without regard to
> whether the alien may be arrested or imprisoned again for the same offense.

8  8 U.S.C. § 1226(c) (brackets and emphasis supplied).  The primary question presented is whether

9  "when . . . released" means immediately upon release or at any time after release.  For three

10 reasons, the Court finds that the former meaning controls.

11    First, the language itself establishes a mandate with an inherent immediacy requirement.  By

12 including the language "[t]he Attorney General ***shall***" in Section 1226(c), Congress issued a

13 command that the Government take into custody such individuals at the moment they are released

14 ("when . . . released") from state custody, not at some undefined time in the future.  Such is the

15 meaning of the term "when" as used in this manner.  If one is commanded to do something "when"

16 another event occurs, the term "when" cannot reasonably be read to permit potentially unbounded

17 delay.  The fact that there is a command, which admits of no discretion by its very nature, does not

18 support the notion that the action commanded can be undertaken at the leisure of the subordinate

19 party.  Had Congress intended to provide the Government discretion as to when Section 1226(c)'s

20 mandatory detention commences, it would not have used mandatory language.  Instead, it would

21 have enacted language such as "at any point after the alien is released" or "after the alien is

22 released."  The fact that no such language appears in the statute cannot be ignored.  The Court

23 cannot, and will not, strain to "read into" Section 1226(c) language that is simply not there, for to

24 do so would be to contrive rather than to interpret.  As it is written in Section 1226(c), "when . . .

25 released" can be read only to mean at the time of release.

26    Second, reading Section 1226(c) as a single, cohesive sentence reveals that Congress had

27 timing in mind when it enacted Section 1226(c).  The "when . . . released" clause immediately

28

precedes the clause "without regard to whether the alien is released on parole, supervised release, or probation." The nature of the individual's release — whether he or she is released on parole, supervised release, or probation — manifests at the moment of release. That Congress explicitly acknowledged events that occur *simultaneously* with an individual's release and stated that said events shall not bear on the Government's obligation to apprehend such individuals makes clear that said apprehension must occur at the moment the individual is released. Furthermore, the "when . . . released" command exists not only "without regard" to events that occur at the moment of release, such as the nature of that non-custodial release, but "without regard" to possible *future* events that have yet to manifest ("whether the alien may be arrested or imprisoned again for the same offense"). In this one sentence, Congress acknowledged both present and future possibilities and nonetheless required that the Attorney General "take into custody" such individuals "when [they are] released." Thus, by specifically choosing the word "when," as opposed to other terms such as "at any time after" or simply "after release," Congress emphasized that the directive was time-sensitive: the person must be taken into custody at the time of release from state custody and not at any point in time thereafter.

Third, that Section 1226(c) sets forth an immediacy requirement is further reinforced by assessing how Section 1226(c) interacts with the rest of Congress's statutory scheme. In Section 1226, Congress set forth a statutory framework for the detention of noncitizens pending removal proceedings. Section 1226(c)'s mandatory detention provision is an exception within that broader scheme. The more generally applicable provision, Section 1226(a), affords the Government both deference and discretion as to whether an individual is either detained pending removal proceedings or released on bond. In contrast, the language of 1226(c) eliminates that discretion where a certain class of individuals are concerned. To find that the Attorney General has potentially boundless discretion as to when it discharges its obligations under Section 1226(c) runs counter to the language and structure of Section 1226. Indeed, it is illogical: both the language and structure of Section 1226 establish that Congress's directive to the Government regarding apprehension of certain criminal aliens was both time-sensitive and non-discretionary.

United States District Court
Northern District of California

1    Given the interplay between Sections 1226(a) and (c), it makes sense that the plain language

2    of the statute commands the Attorney General to apprehend specified criminal aliens "when [they

3    are] released," and no later.  The individuals defined in Section 1226(c)(1)(A) through (D) are those

4    who have committed criminal offenses and for whom removal was Congress's priority.  Congress

5    enacted a statutory scheme that contemplated immediate apprehension of these individuals upon

6    release from state custody, thus effecting a *seamless transition* and ensuring effective and efficient

7    removal.  Reading Section 1226(c) in a manner that credits its plain meaning serves this logical,

8    sensible purpose.

9    The Government's three arguments to the contrary are unpersuasive.  First, the Government

10   proposes that the meaning of the phrase "when the alien is released" is ambiguous because it can be

11   read to establish the point in time when the Government's duty to apprehend a criminal alien

12   *begins*.  (*See* Dkt. No. 24 at 14; Dkt No. 32 at 11.)  Under the Government's reading of the statute,

13   its authority to "take into custody" an individual contemplated in Section 1226(c) begins at the

14   moment the individual is released from state custody and may be discharged at the Government's

15   discretion.  That reading of the statute strains credulity.  It runs counter to both the plain meaning of

16   the term "when" as used in Section 1226(c)(1) and the structure of Section 1226 as a whole.  As set

17   forth above, Congress chose the word "when," not the word "after" or something similar.  If the

18   Government's duty merely begins at the point of release, the Government is free to ignore Section

19   1226(c)'s mandate indefinitely.  This interpretation finds no support in Section 1226(c)'s language

20   or Section 1226 generally.  Indeed, it appears that the Government's argument is motivated by the

21   fact the Government finds it difficult to comply with Congress's directive.  This concern is

22   unavailing.  Practical difficulties cannot change or undermine the statute's plain language.

23   Second, the Government argues that the meaning of "when" is imprecise, citing dictionaries

24   to show that the term can take on various meanings.  (*See* Dkt. No. 24 at 15; Dkt. No. 32 at 12.)  To

25   support this argument, the Government points to cases in which other courts have found that the

26   term "when" has at least two possible meanings, such as "at any time after" and "immediately

27   upon."  Although a term may potentially possess two meanings in other circumstances, it does not

28   follow that the term therefore must be ambiguous as used in Section 1226(c).  Such myopia has no

place in statutory interpretation. A court must read the words of a statute "in their context and with a view to their place in the overall statutory scheme." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2001) (citations omitted); *see also United States v. Morton*, 467 U.S. 822, 828 (1984) ("[W]e do not . . . construe statutory phrases in isolation; we read statutes as a whole.") (citations omitted).

Courts have long employed the canon of looking to the words surrounding the term at issue and the statutory structure in which the term is used to discern meaning, for "a word is known by the company it keeps." This canon, also known as *noscitur a sociis*, prevents a court from "ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). Taking a full view of Section 1226(c), with particular attention to the structure of the sentence at Section 1226(c)(1) and the relationship between Sections 1226(a) and (c), it is evident that "when" can mean only "at the moment" of release. To hold otherwise would read "unintended breadth" into Section 1226(c) by sanctioning the Government's practice of delaying apprehension of criminal aliens for months, years, or even decades after they are released from state custody.

Third, as an alternative argument, the Government submits that the phrase "when . . . released" cannot bear on the category of individuals subject to mandatory detention because those contemplated in subsection 1226(c)(1)(D) specifically would never have been subject to predicate custody. (Dkt. No. 32 at 13; Dkt. No. 45 at 1–2.) By extension, the Government posits that if the "when . . . released" requirement cannot apply literally to individuals falling within the scope of subsection (D), this Court should find that the "when . . . released" requirement applies to *no* individual contemplated in the entirety of Section 1226(c)(1)(A), (B), or (C). The argument does not convince, for it would have the effect of reading the "when . . . released" requirement out of the statute entirely. Moreover, the Government's suggestion that reading Section 1226(c) to require immediate apprehension would hamstring the Government's ability to detain individuals suspected of terrorist activity is unavailing as a practical matter. Section 1226(c) does not operate in a vacuum; there are other statutes that enable the Government to apprehend specifically individuals

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1    suspected of terrorist activities.  *See, e.g.*, 8 U.S.C. § 1226(A) (entitled "Mandatory detention of

2    suspected terrorists; habeas corpus; judicial review").  There is thus no practical concern that

3    reading Section 1226(c) for what it says would render the Government unable to apprehend

4    individuals contemplated by subsection (D).[6]  In addition, it is not clear that reading Section

5    1226(c) for what it says presents an inherent contradiction by referring to subsection (c)(1)(D)

6    individuals and requiring that there be predicate custody.  Ostensibly, individuals falling within the

7    ambit of subsection (D) could be subject to custody for an unrelated offense, serve time in state

8    custody for that non-subsection (D) offense, and "when . . . released," be apprehended by the

9    Government for activities falling under subsection (D).  Thus, the Government's suggestion that

10   there can be no sensible reconciliation of "when released" with the individuals contemplated by

11   subsection (D) falls flat.

12         In sum, the Court finds that the plain reading of the statute supports Petitioners'

13   interpretation.  "When . . . released" means what it says: an individual falls within Section 1226(c)

14   if detained at the time he or she is released from state custody.  In so holding, the Court is in good

15   company.  Although the Ninth Circuit has yet to rule on this question, "[t]he majority of district

16   courts in this [] circuit[] hold that the 'when . . . released' language is unambiguous," and that the

17   mandatory detention provision applies to only individuals who have both committed an enumerated

18   offense and are detained upon their release.  *Deluis-Morelos v. ICE Field Office Dir.*, 2013 WL

19   1914390, at *4 (W.D. Wash. May 8, 2013); *see, e.g.*, *Khoury v. Asher*, No. 13-cv-1367, Dkt. No. 44

20   (W.D. Wash. Mar. 11, 2014); *Espinoza v. Aitken*, 2013 WL 1087492, at *6 (N.D. Cal. Mar. 13,

21   2013) (holding "when . . . released" language limits scope of mandatory detention provision to

22   criminal aliens detained when released where detainee was arrested by ICE six months after

23   conviction and sentence of probation and time served); *Bumanlag v. Durfor*, 2013 WL 1091635

---

24

25   [6]  The Government's suggestion that reading the statute for what it says would in some way hinder
26   its ability to detain individuals for subsection (D) offenses pursuant to Section 1226(c) appears
     disingenuous in light of the fact that in response to the Court's order that the Government provide
27   figures on the size of the potential class, the Government responded with data concerning
     individuals held pursuant to offenses enumerated in only subsections (A) through (C).  The
28   Government did not provide any figure reflecting the number individuals currently held under
     Section 1226(c) for subsection (D) offenses.  (*See* Dkt. No. 46 ("Joint Submission") at 10.)

United States District Court
Northern District of California

1   (E.D. Cal. Mar. 15, 2013) (holding same where detainee was arrested by ICE seven years after

2   release from prison); *Dighero-Castaneda v. Napolitano*, 2013 WL 1091230, at * 6 (E.D. Cal. Mar.

3   15, 2013) ("8 U.S.C. § 1226(c) does not apply unless the petitioner is taken into custody

4   immediately or very shortly following his or her release from custody on the underlying removable

5   offense."); *Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1229–30 (W.D. Wash. 2004) (holding

6   same).  Many courts outside this circuit have similarly found that the language "when . . . released"

7   unambiguously requires an individual to have been detained upon release from criminal custody for

8   an offense enumerated by Section 1226(c)(1) in order to be subject to mandatory detention under

9   Section 1226(c).  *See e.g.*, *Gordon v. Johnson*,  2013 WL 6905352 (D. Mass. Dec. 31, 2013);

10  *Castaneda v. Souza*, 952 F. Supp. 2d 307, 317–318 (D. Mass. 2013); *Valdez v. Terry*, 874 F. Supp.

11  2d 1262, 1264 (D. N.M. 2012) (collecting cases demonstrating that the "*majority* of federal district

12  courts that have ruled on this issue have agreed that the language 'when the alien is released' in §

13  1226(c) unambiguously means immediately after their release" and have rejected the BIA's

14  interpretation of § 1226(c) in *Matter of Rojas*) (emphasis in original); *Ortiz v. Holder*, 2012 WL

15  893154, *3 (D. Utah Mar. 14, 2012) (joining the "vast majority of federal courts that have

16  addressed this issue" and holding that because petitioner was not taken into immigration custody

17  when he was released, Section 1226(c) does not apply).

18         Accordingly, for the reasons set forth above, the Court finds that Section 1226(c)

19  unambiguously requires that individuals be detained immediately upon release from custody in

20  order to be subject to Section 1226(c)(2)'s mandatory detention provision.  If individuals are not

21  detained "when [they are] released" from state custody, the Government may detain them pending

22  removal proceedings pursuant to Section 1226(a), which requires that they be afforded a bond

23  hearing.

### 3.  Section 1226(c)'s Legislative History Confirms Its Plain Meaning

25         Although the Court's analysis can end at this juncture, it bears noting that the political

26  context in which Section 1226 was enacted confirms that the plain language of the statute requires

27  apprehension at the time of release and no later.  In *Demore v. Kim*, 538 U.S. 510 (2003), the

28  Supreme Court considered the constitutionality of Section 1226(c)'s mandatory detention provision

and provided a fulsome explication of the statute's origin.  There, the Supreme Court found that Congress enacted Section 1226(c) "against a backdrop of wholesale failure by the [Immigration and Naturalization Service ("INS")][7] to deal with increasing rates of criminal activity by aliens." *Demore*, 538 U.S. at 518 (citing Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); S. Rep. No. 104–48, p. 1 (1995) (confinement of criminal aliens alone cost $724 million in 1990)).  Having undertaken to determine how to ensure that such individuals would assuredly be deported, Congress's investigations revealed infirmities in INS's processes.  For example, Congress learned that "the INS could not even *identify* most deportable aliens, much less locate them and remove them from the country."  *Demore*, 538 U.S. at 518 (emphasis in original) (citation omitted).  The result was not simply a monetary cost on the Nation, but also a cost on other potential immigrants who sought to enter the United States and on the public due to the crimes such individuals committed before being removed.  *Id.*  The Supreme Court further noted that "deportable criminal aliens who remained in the United States often committed more crimes before being removed.  One 1986 study showed that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began."  *Id.* at 518–19 (citing Hearing on H.R. 3333 before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, 101st Cong., 1st Sess., 54, 52 (1989)).  Given this context, it makes sense that Congress wanted to ensure that certain criminal aliens would not be released following time served for certain offenses.  Reading Section 1226(c) for what is says furthers that goal by ensuring a seamless transition from state to federal immigration custody and ensuring efficient removal proceedings for certain offenders.

Cognizant that Section 1226(c)'s new seamless transition mandate would require the INS to change considerably its policies and procedures, Congress passed the Transition Period Custody Rules ("TPCR") concurrently with Section 1226(c).  *See* Illegal Immigration Reform and

---

[7] On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice, and ICE, an agency within DHS, assumed INS's detention and removal authority.

United States District Court
Northern District of California

Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, § 303(b)(2), 110 Stat. 3009, 3009-586 (Sept. 30, 1996).  The TPCR suspended the implementation of the mandate in Section 1226(c) for one year to provide the INS time to implement necessary changes.  *See Matter of Garvin-Noble*, 21 I&N Dec. 672, 675, 678 (BIA 1997) ("Congress evidently preferred mandatory detention pending deportation but understood that detention space and other practical limitations temporarily stood in the way of that preference.")

In light of Congress's objectives in enacting Section 1226(c), specifically remedying the Government's failure to detain and remove a subset of criminal aliens, it is illogical to read Section 1226(c) as permitting potentially limitless delay in their apprehension.  Doing so would have the practical effect of rendering the detention contemplated by Section 1226(c) discretionary in the first instance, for the Government could simply choose to delay apprehension indefinitely.  Taken to its extreme, this reading of Section 1226(c) would effectively sanction the Government's "wholesale failure" to deal effectively with and remove criminal aliens.  *See Demore*, 538 U.S. at 518.  The one-year suspension of Section 1226(c) suggests all the more that Congress intended to require seamless transition from state to federal custody "when" such individuals are released from state custody.[8]  Congress's intent, evident from the plain language of the statute and reinforced by the context in which it was passed, was that Section 1226(c) would function as a mandate, effecting seamless transitions from custody to immigration detention for a select class of deportable persons for whom removal was Congress's priority.[9]  The Government's inability to follow this mandate

---

[8] The Government argues that the TCPR provided the Government time to implement the processes required for Section 1226(c)'s mandatory detention requirement, not to perfect that process.  The Government further argues that practical considerations, such as sanctuary city ordinances and limited federal resources, render seamless transition from state to federal custody difficult.  These arguments are unavailing.  As explained above, Congress made clear that the Government "shall take into custody" the individuals in question "when [they are] released."  The fact that the Government fails to comply with this mandate is not a reason for this Court to interpret Congress's language as sanctioning such noncompliance.

[9] Indeed, after enacting Section 1226(c), Congress remained apprised the INS's efforts to identify and remove criminal aliens.  To that end, the General Accountability Office provided reports and testimony.  In 1997, the GAO provided to the House Committee on the Judiciary a report, entitled "Criminal Aliens: INS' Efforts to Identify and Remove Imprisoned Aliens Need to Be Improved." GAO/T-GGD-97-154 (July 15, 1997).  The GAO provided a follow-up to that report in 1998,

United States District Court
Northern District of California

does not change the statute's plain language nor can it be a basis for broadening the Government's authority.  To hold otherwise would not only do violence to the statute, it would have the perverse effect of validating the Government's failure to comply.

### 4.   The Government's Remaining Arguments Do Not Persuade

#### a.   *Matter of Rojas* does not merit any deference

Having found that Section 1226(c) is unambiguous, it thus follows that the BIA's decision upon which the Government relies, *Matter of Rojas*, merits no deference under *Chevron*.  However, in the interest of clarity and completeness, the Court will now address the myriad other reasons why *Rojas* cannot stand.

As an initial matter, the BIA's framing of the question presented in *Rojas* differed from the question before this Court.  In *Rojas*, the dispositive question was not whether the language "when the alien is released" in Section 1226(c) is ambiguous.  To the contrary, BIA expressly concluded that the "when . . . released" language *was not* ambiguous: Section 1226(c) "does direct the Attorney General to take custody of aliens ***immediately upon their release*** from criminal confinement."  *Rojas*, 23 I. & N. Dec. at 122 (emphasis supplied).  Instead, the BIA focused on the language of Section 1226(c)(2), which defines the category of persons to whom the mandatory detention provision applies, *i.e.*, as those "alien[s] described in paragraph (1)."  Thus, the BIA sought to determine whether the "alien described in paragraph (1)" referred to:  (1) individuals who have committed offenses enumerated in paragraphs (1)(A) through (1)(D), or (2) those same

entitled "Criminal Aliens:  INS' Efforts to Identify and Remove Imprisoned Aliens Continue to Need Improvement."  GAO/GGD-99-3 (October 1998).  And in 1999, the GAO provided testimony to the same effect.  *See* GAO/T-GGD-99-47 (February 25, 1999) ("1999 Testimony").  Although these reports concerned primarily the INS's effectuation of Institutional Hearing Program procedures, whereby removal proceedings would be initiated and completed for criminal aliens while in state or federal custody, the reports are notable for their consistent acknowledgement of INS's chronic failure to even *identify* criminal aliens while they are in state custody in the first place, and furthermore, for INS's failure to take said individuals into custody "upon their release from prison."  (*See* 1999 Testimony at 2 ("As was the case when we reported to this Subcommittee in July 1997, we again found that INS . . . did not fully comply with the legal requirements that it . . . . (2) take [criminal aliens who had committed aggravated felonies] into custody upon their release from prison"); *id.* at 6 ("INS still is not doing all it should to ensure that it is initiating removal proceedings for aggravated felons and taking them into custody upon their release from prison.")) (*See also* Dkt. No. 39.)

individuals but who were also detained "when . . . released" from state custody.  *See Rojas*, 23 I. &
N. Dec. at 125.  The *Rojas* court opted for the former.  *Id.* ("We construe the phrasing 'an alien
described in paragraph (1),' as including only those aliens described in subparagraphs (A) through
(D) of section 236(c)(1) of the Act, and as not including the 'when released' clause.").

A closer look at the analysis presented in *Rojas* reveals its infirmity.  It is a "'cardinal
principle of statutory interpretation' [] that 'a statute ought, upon the whole, to be so construed that,
if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"
*TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted); *see also United States v.
Menasche*, 348 U.S. 528, 538–39 (1995) ("It is our duty to give effect, if possible, to every clause
and word of a statute") (internal quotation marks omitted); *Rojas*, 23 I&N at 134 (Rosenberg, J.,
dissenting) (citing *Menasche*, 348 U.S. 528).  While the *Rojas* majority recognized that the phrase
"when . . . released" created an immediacy requirement, it then read that requirement out of the
statute entirely.  *See Rojas*, 23 I. & N. Dec. at 125.  In so doing, the BIA rendered the "when . . .
released" clause entirely superfluous.

As explained above, the structure of Section 1226(c) does not support the notion that the
"when . . . released" clause is an excisable part of the statute.  "Paragraph 1" is only one sentence
long; "when . . . released" is an inextricable part of the sentence.  The task of interpreting a statute
does not present an opportunity for a reviewing body to determine which of Congress's words are
necessary and which may be ignored.  All of Congress's words are assumed to serve a purpose; it is
the Court's role to determine what those words mean.  Where, as here, the BIA found the terms
"when . . . released" to have one clear meaning – to provide a mandate that the Attorney General
apprehend a class of individuals ***immediately upon their release*** from criminal confinement – the
BIA was not free to find the "when released" language unnecessary and thereby administratively
eviscerate Congress's mandate.

For good reason, the cases that rely upon *Rojas* are few.  The most prominent of these is the
Fourth Circuit decision, *Hosh v. Lucero*, 680 F.3d 375 (4th Cir. 2012).  There, in a short decision, the
Fourth Circuit referred to a dictionary definition of the word "when" and concluded that because the
term in isolation can be read to have different meanings, it therefore was ambiguous as used in Section

1226(c).  *See Hosh*, 680 F.3d at 379–80 ("'[W]hen' in § 1226(c) can be read, on one hand, to refer to 'action or activity occurring 'at the time that' or 'as soon as' other action has ceased or begun.'" *Waffi v. Loiselle*, 527 F. Supp. 2d 480, 488 (E.D. Va. 2007) (citing 20 *The Oxford English Dictionary* 209 (2d ed. 1989); *The American Heritage Dictionary of the English Language* (4th ed. 2000)).  On the other hand, 'when' can also be read to mean the temporally broader 'at or during the time that,' 'while,' or 'at any or every time that. . ..' *Free Merriam–Webster Dictionary, available at* http://www.merriam-webster.com/dictionary/when (last visited April 30, 2012).").  It therefore deferred to the BIA's interpretation.

The Fourth Circuit decision did not examine the structure of Section 1226(c) and the meaning of the word "when" in that context, or the relationship between the mandatory detention requirements set forth in Section 1226(c) and the permissive detention requirements set forth in Section 1226(a).  *Cf. Brown & Williamson*, 529 U.S. at 132-33.  Nor did the Fourth Circuit evaluate the nature of the BIA's reasoning in *Rojas*, its application of canons of statutory interpretation, or its concession that the term "when . . . released" was *not* ambiguous.  *See Bogarin-Flores v. Napolitano*, 2012 WL 3283287, at *3 (S.D. Cal. Aug. 10, 2012) (finding *Hosh* unpersuasive as it failed to "present any independent reasoning or statutory construction"); *Baquera v. Longshore*, 948 F. Supp. 2d 1258, 1263 (D. Colo. 2013) ("Presumably because of the inadequacy of the analysis in *Rojas* and the dearth of analysis in *Hosh* itself, *Hosh* has had little persuasive impact beyond the Fourth Circuit . . . .").

Accordingly, the Court declines to accord persuasive weight to *Hosh*, and rejects *Rojas* as inconsistent with Section 1226(c)'s plain language and as an unreasonable application of the canons of statutory construction.

### b.  The "loss of authority" doctrine does not apply

Other courts have reached the same practical conclusion as *Rojas* but on different grounds.  The Third Circuit's ruling in *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150 (3d Cir. 2013) is the most prominent.  There, citing the Supreme Court's decision in *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990), the Third Circuit avoided the need to determine whether Section 1226(c) contained any ambiguity by relying on the "loss of authority" doctrine to find that the Government

United States District Court
Northern District of California

21

does not lose its authority to detain individuals under Section 1226(c) even if it fails to detain them "when . . . released." *See Sylvain*, 714 F.3d at 157 ("We need not take a stand on this issue.  Even if the statute calls for detention 'when the alien is released,' and even if 'when' implies something less than four years, nothing in the statute suggests that immigration officials lose authority if they delay."); *see also Hosh*, 680 F.3d at 381–82 (noting that although the statute was ambiguous and the BIA's decision correctly decided, even were it not so, the Government would retain its authority to apprehend an individual long after the date of release from custody under the "loss of authority" doctrine).  Thus, these courts have found that the Government's obligation to apprehend an individual who has committed an offense enumerated in Section 1226(c)(1)(A)–(D) may be discharged at any point after the individual is released.

As an initial matter, it bears noting that the application of this doctrine effectively "reads out" of the statute the "when . . . released" language, which for all the reasons explained above is an undesirable result.  But beyond that, the case upon which the Government relies, *Montalvo-Murillo*, is distinguishable and therefore inapplicable to the question at hand.  In *Montalvo-Murillo*, the Supreme Court addressed whether the Government lost authority to seek pretrial detention of an individual pending his criminal trial if it did not timely request a hearing.  495 U.S. at 713–14. There, a magistrate judge ordered the criminal suspect released on bond.  After a *de novo* detention hearing, the district court disagreed and found that the suspect was a flight risk.  The district court nevertheless ordered the suspect released because the detention hearing had not been held "upon the person's first appearance," as required by the Bail Reform Act of 1984. 18 U.S.C. § 3142(f) (West 1990).[10]  The Tenth Circuit affirmed, and the Supreme Court reversed.

[10] The relevant language from the Bail Reform Act at issue in *Montalvo-Murillo* was as follows:

**(e) Detention.** If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

* * *

**(f) Detention hearing.** The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of the person as required and the safety of any other person and the community—

United States District Court
Northern District of California

1    The Supreme Court found that although there was a "vital liberty interest" at stake, "the Act

2  is silent on the issue of a remedy for violations of its time limits.  Neither the timing requirements

3  nor any other part of the Act can be read to require, or even suggest, that a timing error must result

4  in release of a person who should otherwise be detained." *Montalvo-Murillo*, 495 U.S. at 716–17.

5  Accordingly, the Court held that "a failure to comply with the first appearance requirement does

6  not defeat the Government's authority to seek detention of the person charged." *Id.* at 717.  In so

7  holding, the Court relied on the "'great principle of public policy, applicable to all governments

8  alike, which forbids that the public interests should be prejudiced by the negligence of the officers

9  or agents to whose care they are confided.'" *Id.* at 718 (quoting *Brock v. Pierce County*, 476 U.S.

10  253, 260 (1986) (quotation marks omitted)).

11    Unlike the facts of the instant case, the circumstances of *Montalvo-Murillo* created a stark

12  choice:  finding that the government's authority to detain expired if the statutory timeline was

13  missed would result in release of an individual who had been deemed a flight risk.  The public

14  would bear the cost of the Government's delay, and that cost would be substantial.  But unlike the

15  Bail Reform Act provision in *Montalvo-Murillo*, Section 1226 does not lack for a remedy in the

16  event that the Government fails to apprehend an individual "when [he or she is] released" from

17  state custody as required under Section 1226(c).  In the event that the Government fails to

18  apprehend an individual promptly, the individual does not automatically become "immune from

19  detention." *Compare Montalvo-Murillo*, 495 U.S. at 722.  Rather, the individual remains subject to

20  detention pursuant to Section 1226(a), which entitles him or her to a bond hearing.  Thus, the

21  Government retains its ability to detain individuals like Petitioners, it simply has to afford them a

22  bond hearing as required by Section 1226(a).  If determined to be a flight risk or a threat to public

23  safety, detention pending removal proceedings remains proper; there is no "threat that we must

24  embarrass the system by releasing a suspect certain to flee from justice." *See id.* at 721.

25    * * *

26    The hearing shall be held immediately upon the person's first appearance before the judicial
officer unless that person, or the attorney for the Government, seeks a continuance.

27

28  18 U.S.C. § 3142(e)–(f) (West 1990)); *see Gutierrez v. Holder*, 2014 WL 27059, at *5–6.

The Government argues that if Section 1226(c) is read to require that the Government effect a seamless transition from federal to state custody, Petitioners would receive the undue "windfall" of a bond hearing.  The Government further argues that holding the Government to the immediacy requirement in Section 1226(c) would effect a sanction on the public.  These arguments are unpersuasive.  Providing such individuals a bond hearing can hardly be said to constitute a "windfall."  First, affording a bond hearing *is* the general rule; the lack thereof pursuant to Section 1226(c) is the exception.  Second, the Ninth Circuit has held that individuals such as Petitioners must receive a bond hearing after six months of detention *even if they are properly detained* pursuant to Section 1226(c).  *See Rodriguez II*, 715 F.3d at 1138.  Third, it cannot be seriously argued that requiring the Government to provide individuals such as Petitioners bond hearings impinges the public interest.  The individuals at issue will not be released unless they can demonstrate that they are not a flight risk or danger to the public.[11]

****

For all the reasons set forth above, the Court holds that the "when . . . released" clause of Section 1226(c) means what it says.  Individuals who have committed an offense enumerated at Section 1226(c)(1)(A)–(D) must also be detained by the Government at the time they are released from criminal custody in order to be subject to the mandatory detention provision in Section 1226(c)(2).  The Government's practice of subjecting to mandatory detention individuals who were not apprehended when released from state custody runs afoul of Congress's clear command.

The parties having conceded that their respective motions rise and fall with the resolution of this critical issue, Petitioners' Motion for Preliminary Injunction is granted and the Government's Motion to Dismiss is denied.  The Court now considers Petitioners' Motion for Class Certification.

---

[11] According to the parties' Joint Submission following oral argument, ICE currently detains between 200 and 300 individuals under Section 1226(c) in the prospective class who were not transferred directly from criminal custody into immigration detention for the crime(s) for which they are removable under subparagraphs (A) through (C).  The Court notes that this figure does not account for any individuals held under subparagraph (D).  (*See* Joint Submission at 10.)  Further, according to the Declaration of Michael Tan, counsel for petitioners in *Rodriguez v. Robbins*, Case No. CV-07-3239, in a one-month period following issuance of an injunction in that case, the Government held 171 bond hearings.  (Dkt. No. 47, Ex. A at 3.)

**IV. MOTION FOR CLASS CERTIFICATION**

Petitioners seek to certify as a class:

Individuals in the state of California who are or will be subjected to mandatory detention under 8 U.S.C. section 1226(c) and who were not or will not have been taken into custody by the Government immediately upon their release from criminal custody for a Section 1226(c)(1) offense.

(*See* Dkt. No. 8 at 1; Dkt. No. 47 at 9–10.)[12]  Petitioners also ask that they be named as representative plaintiffs and that their counsel be appointed class counsel.

**A. LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)) (internal quotation marks omitted).  The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the three requirements under Rule 23(b) are met. *Wal-Mart*, 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  While the Court retains broad discretion to certify a class, the Court must conduct a "rigorous analysis" to confirm that the plaintiff has in fact established the requirements of Rule 23 to ensure that a departure from the general rule of individual litigation is justified.  *General Tel. Co. v. Falcon*, 457 U.S. 147, 160–61 (1982).  "While ordinarily disfavored, the Ninth Circuit has recognized that class actions may be brought pursuant to habeas corpus." *Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010) ("*Rodriguez I*") (citations omitted).

---

[12] The proposed class does not include individuals in custody for Section 1226(c) offenses who were transferred to criminal custody outside the state of California, nor does it include individuals held outside the state of California under the authority of ICE field directors in the state of California, because such individuals are not, or have not yet been, detained in immigration custody in California pursuant to Section 1226(c).  (Dkt. No. 47 at 9–10.)  Nor does it include individuals detained pursuant to Section 1226(c) who were not apprehended immediately upon release from custody but who have already been afforded bond hearings.

25

In order to certify a proposed class, the Court must find that the moving party has complied with the prerequisites of both subparts (a) and (b) of Fed. R. Civ. P. Rule 23.  The Court addresses each part in turn.

### B. APPLICATION OF RULE 23(A)

#### 1. Numerosity

Plaintiffs satisfy Rule 23(a)(1)'s numerosity requirement if "the class is so large that joinder of all members is impracticable."  *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506 (N.D. Cal. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998); *see also Davis v. Astrue*, 250 F.R.D. 476, 485 (N.D. Cal. 2008) ("As a general rule, classes numbering greater than 41 individuals satisfy the numerosity requirement.") (citing 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.22 [1] [b] (3d ed.2004)).

The numerosity requirement has been met in this case.  The Government concedes that ICE currently detains between 200 and 300 individuals in California pursuant to Section 1226(c) who were not detained by ICE immediately upon release from criminal custody for their 1226(c)(1) offenses.  (*See* Joint Submission at 10.)  Thus, the Court finds that Petitioners have satisfied Rule 23(a)(1)'s numerosity requirement.  *See Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 346 (N.D.Cal.2008) (finding numerosity requirement satisfied where plaintiffs only identified 22 potential class members); *Santillan v. Ashcroft*, 2004 WL 2297990, at *9 (N.D. Cal. Oct. 12, 2004).

#### 2. Commonality

"Commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke."  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (citation and quotation marks omitted).  "Rule 23(a)(2) has been construed permissively."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  "[T]he key inquiry is not whether the plaintiffs have raised common questions . . . but rather, whether class treatment will 'generate common *answers* apt to drive the resolution of the litigation.'"  *Abdullah*, 731 F.3d at 957 (quoting *Wal-Mart*, 131 S.Ct. at 2551).  "This does not, however, mean that *every* question of law or fact

United States District Court
Northern District of California

must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'" *Id.* (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 582, 589 (9th Cir. 2012)).

The Court finds that Petitioners have demonstrated sufficient commonality to satisfy Rule 23(a)(2) because the resolution of one single question—whether Section 1226(c) requires immediate detention by ICE or whether Section 1226(c) permits the Government's practice of delaying apprehension—will resolve "in one stroke" all class members' claims. *See Rodriguez I*, 591 F.3d at 1122–24 (finding commonality even though class members were detained pursuant to different statutes and under different factual circumstances because a single question—whether a bond hearing was required for individuals detained longer than six months—was "posed by the detention of every member of the class and their [individual claims would] largely be determined by its answer"). As Petitioners argue, and as the Government conceded at the hearing on these motions, this Court's decision on the merits of Petitioners' statutory interpretation claim would effectively and efficiently resolve the claims of all potential class members "in one stroke." Further, in keeping with the purpose of class action litigation, settling this common question would "render management of [proposed members'] claims more efficient for the courts" and "would also benefit many of the putative class members by obviating the severe practical concerns that would likely attend them were they forced to proceed alone." *Rodriguez I*, 591 F.3d at 1123.

### 3. Typicality

"The typicality requirement looks to whether the claims of the class representatives are typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez I*, 591 F.3d at 1124 (citation and internal quotation marks omitted). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether

27

1   other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508

2   (quotation omitted).  "Where the challenged conduct is a policy or practice that affects all class

3   members . . . the cause of the injury is the same"; thus, the analysis requires "comparing the injury

4   asserted in the claims raised by the named plaintiffs with those of the rest of the class." *Davis*, 275

5   F.3d at 868–69.

6        The Court finds the typicality requirement satisfied.  All class members were detained

7   pursuant to Section 1226(c) and therefore denied individualized bond hearings despite the existence

8   of a gap between their release from state custody and federal detention.  (Dkt. No. 8 at 12–13.)

9   Petitioners' claims are typical of those of the potential class members, as both Petitioners' claims as

10  well as those of the proposed class result from the Government's alleged misapplication of Section

11  1226(c).  The injury alleged—detention without a bond hearing pursuant to Section 1226(c) despite

12  the fact that Petitioners were not detained immediately upon release—is the same injury suffered by

13  all of the proposed class members.  The remedy sought —a declaration by this Court that Section

14  1226(c) requires immediate detention and an order granting bond hearings for class members—is a

15  remedy all class members share.

16       The Government's counterarguments are unavailing.  The differences in each Petitioner's

17  gap between release and detention, legal non-citizen status, and challenges each class member may

18  face in a bond hearing are irrelevant to the analysis because "[t]he particular characteristics of the

19  Petitioner[s] or any individual detainee will not impact the resolution of [the] general statutory

20  question and, therefore, cannot render Petitioners' claim atypical." *Rodriguez I*, 591 F.3d at 1124;

21  *see also Santillan*, 2004 WL 2297990, at *11 (noting that the relative differences in time that class

22  members had to wait for the Government to process immigration status updates were "immaterial

23  for purposes of class typicality, which is concerned with the class members' shared interests and

24  harms") (citing *Falcon*, 457 U.S. at 156).

25            **4.  Adequacy of Class Representation**

26       "To satisfy constitutional due process concerns, absent class members must be afforded

27  adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020.

28  "To determine whether named plaintiffs will adequately represent a class, courts must resolve two

United States District Court
Northern District of California

1   questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other

2   class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously

3   on behalf of the class?"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011)

4   (citation and quotation marks omitted).  "A class representative must be part of the class and

5   possess the same interest and suffer the same injury as the class members."  *Amchem Products*, 521

6   U.S. at 625–26 (internal quotation marks omitted).

7          The Government does not contest that Petitioners and their counsel will prosecute the action

8   vigorously.  Rather, the Government focuses on the first prong and argues that Petitioners are not

9   adequate representatives because their interests conflict with those of potential class members.

10  (Dkt. No. 25 at 12.)  The Court disagrees.

11         Typically, conflicts of interest arise in situations where one group of class members seeks

12  relief that would not benefit, or would be to the detriment of, other class members.  *See Amchem*

13  *Products*, 521 U.S. at 625–27 (finding a conflict of interest where a single class included one group

14  of class members who sought immediate settlement payments to be derived from the same fund that

15  would provide for other members who sought future payments).  Here, despite the Government's

16  assertions that the hypothetical differences between Petitioners and potential class members, the

17  Court finds that there is no conflict of interest that would prevent Petitioners from adequately

18  representing the class.  Petitioners' statutory interpretation claim does not depend on the length of

19  time between Petitioners' release and detention; Petitioners' claim concerns pure statutory

20  interpretation.  Petitioners here seek injunctive and declaratory relief that would benefit all

21  proposed class members.  *See Santillan*, 2004 WL 2297990, at *12.  A decision on the merits that

22  the Government's interpretation of Section 1226(c) is incorrect and that the class members are

23  entitled to bond hearings would benefit all proposed class members.  *See also Rodriguez I*, 591 F.3d

24  at 1125 (certifying class consisting of aliens indefinitely detained without bond hearings pursuant to

25  several immigration laws).  Accordingly, the Court finds that Petitioners have satisfied Rule

26  23(a)(4).

27

28

United States District Court
Northern District of California

**C. APPLICATION OF RULE 23(b)**

In addition to satisfying the Rule 23(a) requirements, Petitioners must establish that the proposed class meets the requirements of one class type described in Rule 23(b). FED. R. CIV. P. 23(b)(1)–(3). Petitioners seek certification as a Rule 23(b)(2) class.

To certify a 23(b)(2) class, the Court must find that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). Ordinarily, it follows that there is no need "to undertake a case-specific inquiry into whether class issues must predominate or whether class action is the superior method of adjudicating the dispute" as necessary for the other subsections of Rule 23(b). *Wal-Mart*, 131 S.Ct. at 2558. Rather, "[p]redominance and superiority are self-evident." *Id.*

The Government does not contest that it has acted or refused to act on grounds that apply generally to the class. Nor does the Government contend that the Rule 23(b)(2) class-type is inappropriate in this action. Nonetheless, the Court has undertaken a "rigorous analysis" to ensure the requirement is met.

The Court finds that the proposed class meets the Rule 23(b)(2) requirements. Petitioners and proposed class members have been detained and held without bond hearings pursuant to Section 1226(c) despite the fact that they were not detained immediately "when . . . released" from state custody. Thus, there is no question that Petitioners challenge a uniform Government policy that applies generally to the class, thereby satisfying the first part of Rule 23(b)(2). *See Rodriguez I*, 591 F.3d at 1126 (certifying 23(b)(2) class seeking to challenge government policy of indefinite detention of aliens, finding it sufficient that "class members complain of a pattern or practice that is generally applicable to the class as a whole") (citation omitted). As for relief, Petitioners seek a declaration that Section 1226(c) requires immediate detention upon release from predicate custody and injunctive relief in the form of bond hearings for class members. Because Petitioners seek only injunctive and declaratory relief and a single remedy would provide relief for each class member, the proposed class is appropriate for 23(b)(2) certification. *See Wal-Mart*, 131 S. Ct. at 2557 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief

to each member of the class."); *Rodriguez I*, 591 F.3d at 1126 ("[A]ll class members seek the exact same relief as a matter of statutory or, in the alternative, constitutional right. Hence, we conclude that the proposed class meets the requirements of Rule 23(b)(2)."). Thus, the Court finds that Petitioners satisfy the requirements of Rule 23(b)(2).

## V. CONCLUSION

For all the reasons set forth above, the Court finds that the Government's practice of subjecting to mandatory detention individuals who have committed an offense enumerated at Section 1226(c)(1)(A)–(D) but who were not apprehended "when released" from state custody violates the plain language of Section 1226(c). Petitioners' Motion for Preliminary Injunction is GRANTED. The Government's Motion to Dismiss is DENIED. Furthermore, Petitioners' Motion for Class Certification is GRANTED.

Accordingly, the Court ORDERS as follows:

Within 7 days of the entry of this Order, the parties shall provide to the Court either: (1) a joint proposed Redetermination Notice form, or (2) their individual proposed Redetermination Notice forms. Such proposed notices shall include a statement in plain language that the individual has been reevaluated and is no longer subject to mandatory detention pursuant to Title 8 U.S.C. section 1226(c). The notices shall further include in plain language the result of the non-citizen's custody reevaluation and whether the Department of Homeland Security ("DHS") has determined that the individual should be released on his own recognizance, on Intensive Supervision Appearance Program, or on bond, and if on bond, the amount of the bond that DHS has set. Such notices shall be accompanied by an I-286 Form as well as instructions for requesting a hearing to challenge DHS's custody reevaluation through a bond hearing pursuant to Title 8 U.S.C. section 1226(a), and also notify the individual that should he or she not specifically request a bond hearing, one will be automatically scheduled unless he or she affirmatively declines to have a bond hearing.

IT IS SO ORDERED.

Date: **May 15, 2014**

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

31